



ROSENN, JENKINS & GREENWALD, L.L.P.
James C. Oschal, Esquire
Elizabeth C. Leo, Esquire
15 South Franklin Street
Wilkes-Barre, Pennsylvania 18711-0075
(570) 826-5621

FILED
SCRANTON

JAN 2 7 2003

PER _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GREGORY FOGLEMAN,                    :
                                     :
                    Plaintiff        :        No. 4:CV-98-1746
                                     :        (Judge McClure)
         v.                          :
                                     :
MERCY HOSPITAL, INC.,                :        Jury Trial Demanded
                                     :
                    Defendant        :

### PRE-TRIAL MEMORANDUM

The Plaintiff, GREGORY FOGLEMAN ("GREG"), by and through his

attorneys, Rosenn, Jenkins & Greenwald, L.L.P., hereby submit this Pre-Trial

Memorandum pursuant to Local Rule 16.6. On January 23, 2003, James C.

Oschal, Esquire and Joseph A. O'Brien, Esquire held the conference required

under Local Rule 16.3(b).

### A.    JURISDICTION

This action is brought pursuant to the retaliation provisions of the

Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101, the Age

Discrimination and Employment Act ("ADEA"), 29 U.S.C. §621, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §951; jurisdiction is predicated upon 28 U.S.C. §1331 and 1343.

## B.   SUMMARY STATEMENT OF FACTS AND CONTENTIONS AS TO LIABILITY

GREG was hired by Mercy Hospital, Inc. ("MERCY") on January 5, 1978 as a security officer, and was promoted to Supervisor of Security in 1992. GREG worked for eighteen (18) years without incident or complaint, and had been commended on numerous occasions by supervisors and administrators for his dedication to service and the quality of his work.

In November 1993, Sterril H. Fogleman ("STERRIL"), the father of GREG, had been terminated from his employment by the Defendant in violation of his rights under the ADA, ADEA and PHRA. STERRIL filed a discrimination complaint in this Court which resulted in a substantial settlement on the eve of trial.[1]

After the filing of STERRIL's federal discrimination lawsuit, the Vice-President of Human Resources at MERCY circulated a memo dated July 10, 1995 to all Department Directors and Supervisors and to upper level management labeling GREG as a "risk", given the pendency of his father's lawsuit. The

---

[1] A confidentiality provision in the Settlement Agreement bars disclosure of the actual terms of the settlement.

MERCY felt so strongly about this "risk" that the memo was circulated after consulting with counsel and admittedly in violation of MERCY policy about matters in litigation. Thereafter, and after upper level supervisors and management common to both STERRIL and GREG were deposed in STERRIL's case, and after GREG refused to obtain or provide information to one such common superior about his father's lawsuit after repeated requests, MERCY management was colder to GREG in its dealings with him and his reputation and integrity within MERCY were being questioned.

After STERRIL's deposition in his federal lawsuit had been scheduled for September 17, 1996, an "incident" arose on September 6, 1996 in MERCY's Gift Shop with an elderly volunteer named Audrey Oeller. Ms. Oeller was in the Gift Shop before it was opened that day, and GREG had checked on her well-being, as he had often done before, given her many health problems. GREG, in his capacity as Supervisor of Security, gained access to the Gift Shop by obtaining a spare key from the Maintenance Department.

It is undisputed that nothing was stolen from the Gift Shop and that GREG had routinely checked on Ms. Oeller when she was in the Gift Shop before and after regular business hours. Nevertheless, GREG's Supervisor, Donald Caines, launched an "investigation" into his perceived differences between statements from GREG and Ms. Oeller, respectively, about exactly what happened in the Gift Shop

at that time.    There were minor differences in their statements concerning irrelevant matters such as, for example, the number of sprinkler heads that GREG touched while he was in the Gift Shop and how he got the spare key. Eventually, Ms. Oeller's story admittedly changed in some respects, but GREG's statement remained constant and did not change.

At Mr. Caines' request that same day, and before the end of GREG's shift, GREG submitted an Incident Report which noted no unusual circumstances. However, as a consequence of this "incident" GREG was called into a meeting on September 11, 1996 with Mr. Caines and Joan Edmondson, a representative from the Human Resources Department, and a representative of GREG's choosing. GREG was suspended with pay and was told that MERCY could not get back to him about his fate until the following Tuesday, September 17, 1996. When GREG asked why MERCY could not get back to him until September 17, he was told that the delay was to allow MERCY to complete its investigation.

MERCY has admitted, however, that no further investigation into this "incident" took place between September 11 when GREG was suspended, and September 17 when he was fired. (GREG was told at that time that he was being fired because he failed to file a report about the incident, even though GREG did file an Incident Report before the end of his shift on September 11, 1996). MERCY has also admitted that STERRIL's deposition had been scheduled to take

place on September 17, 1996, the same day that GREG was terminated. Finally, MERCY has admitted that the "incident" in the Gift Shop merited closer scrutiny than usual because of the existence of STERRIL's lawsuit.

The first reason given by MERCY for the termination of GREG's employment was GREG's alleged failure to file a report, even though GREG did file an Incident Report before the end of his shift on September 6, 1996. In fact, MERCY later admitted that this stated reason was not accurate. Later, MERCY gave different reasons for terminating GREG, including alleged "inconsistencies" between his statement and that of Ms. Oeller and that he did not have authority to enter the Gift Shop. All of these alleged reasons for GREG's termination were false. Ms. Oeller later changed her story, but GREG's statement remained constant.[2] Moreover, GREG's job description specifically provided him with the authority to enter the Gift Shop under the circumstances.

Clearly, the reasons given for the termination of GREG's employment were pretextual, and GREG was fired in retaliation for his father's pending federal lawsuit and because MERCY perceived GREG to be supporting his father in that lawsuit.

---

[2]    Ms. Oeller also stated that Mr. Caines "changed what I said." (Oeller Dep. at 50-52).

Additional evidence that the reasons given by MERCY for the termination

of GREG's employment were pretextual include the following:

1.  MERCY violated its own Progressive Discipline Policy when it terminated GREG after almost nineteen (19) years of exemplary employment as a result of this one "incident," especially when other employees and supervisors who were found to have committed more egregious acts, such as theft, intoxication on the job, and harassment of young female summer students, including inappropriate touching, were not fired under those circumstances, but were afforded less severe discipline consistent with the Progressive Discipline Policy;

2.  When there was an alleged inconsistency between the statement of the students who were harassed and fondled and the alleged harasser, Mr. Caines did not fire anyone but simply "monitored" the employee for additional complaints;

3.  No one at MERCY would admit to making the decision to terminate GREG. To the contrary, Mr. Caines testified specifically that he did not fire GREG and that he was very careful not to recommend that GREG be terminated under the circumstances;

4.  At the September 17 meeting at which he was terminated, GREG was offered a "Separation Agreement" in exchange for a General Release for essentially no consideration. When he refused to sign it, MERCY improperly held his back wages hostage that were admittedly owed to him and refused to pay them for three (3) years, until well after this lawsuit was filed. Eventually MERCY paid the back wages in the amount of Seven Hundred Fifty Dollars ($750.00) and liquidated damages under the Pennsylvania Wage and Collection Law in the amount of Five Hundred Dollars ($500.00), as well as attorney's fees associated with the claim in the amount of Five Thousand ($5,000.00) Dollars; and

5.   Even though MERCY never contended that GREG was fired for any willful misconduct or any other reason that would support a denial of unemployment compensation benefits, MERCY appealed the award of these benefits to GREG, and then withdrew its appeal on the eve of the hearing, after GREG was forced to retain counsel because he need unemployment benefits to support his family, in order to inflict maximum monetary damage and emotional distress on GREG.

The termination of GREG under the circumstances by MERCY is actionable under the anti-retaliation provisions of the PHRA, ADA and ADEA.

## C.   **COMPREHENSIVE STATEMENT OF UNDISPUTED FACTS AS AGREED TO BY COUNSEL**

1.   Plaintiff, GREGORY FOGLEMAN, ("GREG") is a competent adult individual residing at 510 South Mountain Boulevard, Apartment 1, Mountaintop, Luzerne County, Pennsylvania 18707.

2.   Defendant, Mercy Hospital, Inc. ("MERCY"), is a Pennsylvania corporation with its principal place of business at 25 Church Street, P.O. Box 658, Wilkes-Barre, Luzerne County, Pennsylvania 18765. (Compl. and Ans. ¶2).

3.   GREG and Michelle Fogleman were married in 1988. (Fogleman Dep. at 4).

4.   GREG and Michelle Fogleman were divorced in 1999. (Fogleman Dep. at 5).

5.   GREG and Michelle Fogleman have two (2) children: Sarah: date of birth: 1/11/90 and Zachary: date of birth: 1/4/93. (Fogleman Dep. at 4-5).

6.   GREG is the son of Sterril Fogleman ("STERRIL"), a former employee of MERCY.

7.   STERRIL had been employed by MERCY since 1976 as the Supervisor of Clinical Engineering until his employment terminated

effective December 14, 1993.  (S. Fogleman Compl., Exh. 5, ¶¶9, 34, 38).

8.  On June 20, 1995, STERRIL filed a civil action in the United States District Court for the Middle District of Pennsylvania against MERCY alleging, inter alia, that the action taken by MERCY on November 29, 1993 constituted a violation of his rights under the Americans with Disabilities Act, the Age Discrimination in Employment Act and the Pennsylvania Human Relations Act.  (Dep. Exh. 5).

9.  GREG was hired by MERCY on January 5, 1978, as a Security Officer (See Compl. And Ans. ¶13) and was promoted to Supervisor of Security in 1992.  GREG worked as Supervisor of Security he was terminated on September 17, 1996.  (Caines Dep. at 61; Fogleman Dep. at 9).

10.· Donald Caines has been the Director of Security and Safety at the Mercy Hospital in Scranton beginning in 1977 (Caines Dep. at 8).

11.  In 1995, after the merger of the Mercy Hospitals in Wilkes-Barre and Scranton, Caines was promoted to the Mercy Health System, Northeast Region's Regional Director of Security and Safety.  (Caines Dep. at 8-9.)

12.  As Regional Director of Security and Safety, Caines is responsible for the entire security and safety operation of all of MERCY facilities in the Northeast including the hospitals in Scranton and Wilkes-Barre.  (Caines Dep. at 9).

13.  An "incident" took place on September 6, 1996, in MERCY Gift Shop involving a volunteer named Audrey Oeller.

14.  On September 11, 1996, as a consequence of this "incident," GREG was called into a meeting with Mr. Caines, his Supervisor, and Joan Edmondson, a Representative from Human Resources.  (Edmondson Dep. at 34).

15.  At this meeting. GREG was told that he was being suspended with pay, pending further investigation of this "incident."  (Caines Dep. at 228-229; Dal Santo Dep. at 52).

16.    At the meeting, GREG was told that MERCY could not get back to him until the following Tuesday, September 17, 1996. (Dep. Exh. 26, & 3.H.6.; Dep. Exh. 27, & 3.H.6.; Dal Santo Dep. at 55; Fogleman Dep. at 139).

17.    GREG was fired on September 17, 1996. (Edmondson Dep. at 62).

18.    GREG had participated in an employee pension plan while he was employed at MERCY.

19.    At the time of his termination, MERCY provided GREG with an annual pension contribution of seven (7%) percent of his plan year pay.

20.    At the time of his termination on September 17, 1996, GREG earned a base annual salary of Twenty-Seven Thousand Eight Hundred Fifty-One ($27,851.00) Dollars (or Thirteen Dollars and thirty-nine ($13.39) cents per hour) plus health insurance, dental insurance and pension or retirement contributions.

## D.    **DAMAGES**

At the time of the termination of his employment on September 17, 1996, GREG's annual salary was Twenty-Seven Thousand Eight Hundred Fifty-One ($27,851.00) Dollars, or $13.39 per hour, plus benefits which included health insurance, dental insurance and annual retirement contributions from MERCY consisting of seven (7%) percent of his annual salary. In April 1998, after numerous job interviews, GREG obtained alternative employment at Benco Dental as a Sales Representative for $8.00 per hour. GREG's position at Benco Dental has required that he pay his own health, dental, and vision insurance, which currently costs GREG Two Thousand Six Hundred Eighty Four Dollars

($2,684.00). Benco Dental makes a minimal contribution to GREG's 401(k) account.

If GREG had remained employed between September 18, 1996 and October 2002, he would have earned $219,416.00.[3] The difference between what GREG would have earned at MERCY and what GREG actually earned at Benco Dental, is $137,486.00 through October 2002, plus interest at the legal rate of 6%.

In addition, in light of the circumstances surrounding his termination and the resulting lawsuit, an award of front pay for a reasonable period of time, as an alternative remedy to reinstatement is appropriate. Goss v. Exxon Office Systems Co., 747 F.2d 885, 890 (3d Cir. 1984). According to the expert report of Verzilli & Verzilli and Consultants, GREG's front pay through age 55 ranges from $141,668.00 to $121,128.00, and front pay through age 64 ranges from $382,947.00 to $305,414.00.

Moreover, GREG is also entitled to damages for his future pecuniary losses due to his decreased earning capacity. Lost future earnings are non-pecuniary in nature and are separate from front pay, which is a pecuniary remedy. See, Williams v. Pharmacia, Inc., 137 F.3d 944, 952 (7th Cir. 1998). Expert and other testimony will establish MERCY's acts of discrimination resulted in GREG being

---

[3]     The report of Verzilli & Verzilli and Consultants details GREG's economic damages through October 2002. Andrew C. Verzilli, M.B.A., will testify at trial. A supplemental report through March 2003 will be produced upon receipt.

forced to take a position in a field completely unrelated to security and for significantly less money, notwithstanding his efforts to obtain employment as a security officer.

Under Title VII and the ADA, compensatory damages, which do not include back pay, front pay, and interest awards, Pollard v. E. I. DuPont de Nemours & Co., ___ U.S. ___, 121 S. Ct. 1946, 150 L. Ed. 2d 62 (2001), are permitted to a maximum of Three Hundred Thousand ($300,000.00) Dollars, as MERCY employs well over 500 employees. 42 U.S.C. § 1981(b). Compensatory damages include any award for emotional distress, mental anguish, and for punitive damages awarded by a jury. Given the facts and circumstances in this case, we feel confident that compensatory damages certainly would be part of a jury award.[4] Moreover, the jury may award GREG damages for the humiliation and injury to his character and reputation that he suffered as a result of the retaliatory termination of his employment. It should be noted that neither the ADEA nor the PHRA sets a cap on compensatory damages. See, 28 U.S.C. § 626(b); 43 P.S. § 959. It is respectfully submitted that the facts and circumstances of this case will lead a jury to find that MERCY's retaliatory conduct was willful. Consequently,

---

[4]    For example, GREG and his ex-wife, Michelle Fogleman, will testify that their marriage broke up because of GREG's depression following the termination of his employment by MERCY. As a consequence, GREG no longer sees his two (2) young children on a daily basis and has had to move out of the family home.

11

GREG is also entitled to an award of liquidated damages under the ADEA. 28 U.S.C. § 626(b).

Finally, GREG is entitled to recover reasonable attorney's fees and costs associated with this litigation if he prevails. At the present time, such fees and costs are in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, as this case had been pending since 1996 and has been all the way up to the United States Supreme Court and back.

## E.   WITNESS LIST

1.  Greg Fogleman
    510 S. Mountain Blvd., Apt. 1, Mountaintop, PA 18707
2.  Michelle Fogleman
    244 Church Road, Mountaintop, PA 18707
3.  Sterril Fogleman
    11 Birchwood Drive, Mountaintop, PA 18707
4.  Virginia Gail Blaum, President of Mercy Hospital/Wilkes-Barre
5.  John Burke, Director of Facilities of Mercy Hospital
    712 Susquehanna Avenue, West Pittston, PA
6.  Donald D. Caines, Regional Director of Security and Safety
    113 South Apple Street, Dunmore, PA
7.  Betsy Dal Santo, Marketing and Public Relations Department
    413 McLane Street, Wilkes-Barre, PA
8.  Joan Edmondson, Director of Human Resources in Scranton
    436 North Dexter Avenue, Scranton, PA 18504
9.  Michael Elias, former Regional Vice President of Support Services
    of Mercy Hospital
    16 Grebe Street, Wilkes-Barre, PA
10. Martin S. Everhart, former Vice President for Human Resources
    for Mercy Health Partners
    26 Rice Court, Dallas, PA
11. Linda McCormick, Payroll Accounting Assistant
    575 Warren Avenue, Kingston, PA
12. Lena Michael, Human Resources

116 Woodview Road, Wilkes-Barre, PA 18702
13.    James O'Brien, Vice President of Legal Affairs
14.    Audrey Oeller, Volunteer in Gift Shop
        190 Dagobert Street, Wilkes-Barre, PA 18702
15.    David J. Searfoss, Maintenance Supervisor
        3 Oxford Street, Lee Park, Wilkes-Barre, PA
16.    Sheila Stozenski, Manager of Mercy Hospital Gift Shop
        10 Powel Avenue, Mountaintop, PA 18707
17.    James Cain, Central Supply, Mercy Hospital
18.    Ken Warman, Housekeeping, Mercy Hospital
19.    Bernard Shinal, Maintenance, Mercy Hospital
20.    Earl Kohl, Maintenance, Mercy Hospital
21.    Ralph Evans, Former Director of Security, Mercy Hospital
22.    Dr. Debra Gorski, Internist, treating physician
23.    Andrew G. Verzilli, Ph.D.
        4096 Durham Road, Ottsville, PA 18942
24.    Andrew C. Verzilli, MBA
        4096 Durham Road, Ottsville, PA 18942

Plaintiff reserves the right to call any witnesses identified in the Defendant's Pre-Trial Memorandum.

**F.    SUMMARY OF EXPERT TESTIMONY**

See attached report.

**G.    SPECIAL COMMENT ABOUT PLEADINGS AND DISCOVERY, INCLUDING DEPOSITIONS AND EXCHANGE OF MEDICAL REPORTS**

None.

**H.    SUMMARY OF LEGAL ISSUES INVOLVED AND LEGAL AUTHORITIES RELIED UPON**

I.    DID MERCY RETALIATE AGAINST GREG FOGLEMAN BECAUSE OF HIS FATHER'S LAWSUIT IN VIOLATION OF THE PHRA, ADA, AND ADEA?

*Suggested answer: Yes*

In the Third Circuit, [5] to prove unlawful retaliation, a plaintiff must establish (1) that he was engaged in protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a casual connection between the employee's protected activity and the employer's adverse action. Goosby v. Johnson and Johnson Medical, Inc., 228 F.3d 313, 323 (3d Cir. 2000) (citing Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)); see, Delli Santi v. CAN Insurance Company, 88 F.3d 192, 199 (3d Cir. 1996). The Third Circuit has held that an employer's perception that an employee has engaged in protected activity satisfies the first element of a retaliation claim. Fogleman v. Mercy Hospital, 283 F.3d 561, 571-572 (3d Cir. 2002), cert. denied, ___ U.S. ___, 123 S. Ct. 112, 154 L. Ed. 2d 35 (2002).

Once the Plaintiff establishes a prima facie case of retaliation, the burden production shifts to the employer to advance a legitimate non-retaliatory reason for its adverse employment action. Woodson v. Scott Paper Co., 109 F.3d 913, 920 n.2 (3d Cir. 1997). If the employer satisfies this burden, the plaintiff must be able

---

[5]   The retaliation provisions of the PHRA and the ADA are modeled after the retaliation provisions of Title VII. Compare, 43 P.S. § 955(d) (PHRA), and 42 U.S.C. § 12203(a) (ADA) and 42 U.S.C. § 623(d) (ADEA), with 42 U.S.C. § 2000e-3(a) (Title VII). Accordingly, the analysis under PHRA, ADA and the ADEA for retaliation claims are conducted under the same framework employed for retaliation claims arising under Title VII. See Dici v. Commonwealth of Pa., 91 F.3d 542, 552 (3d Cir. 1996) (PHRA); Krouse v. American Sterilizer Company, 126 F.3d 494, 500 (3d Cir. 1997) (ADA); Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 n.9 (1st Cir. 1996) (ADEA).

to show that the employer's proffered explanation was false and that retaliation was the real reason for the employment action. <u>Woodson</u>, 109 F.3d at 920 n.2 (quoting <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 512, 113 S. Ct. 2742, 2750, 125 L. Ed. 2d 407 (1993)); <u>Sheridan v. E. I. DuPont</u>, 100 F.3d 1061, 1067-1068 (3d Cir. 1996). In order to make this showing, a plaintiff must prove that retaliatory animus played a role in the employer's decision-making process and that it had a determinative effect on the outcome of that process. <u>Woodson</u>, 109 F.3d at 931-935. Only if the employer proves that the trier of fact could not conclude, as a matter of law, a retaliatory animus played a role in the decision making process in that it had a determinative effect on the outcome, will the defendant prevail. <u>Id.</u>

GREG clearly satisfies the first element of "protected employee activity" under the ADA because of MERCY's attempt to "coerce" or "interfere" with STERRIL's lawsuit through GREG. <u>Fogleman</u>, 283 F.3d at 570-571. GREG also satisfies the first element because he will show that MERCY perceived him to be participating in his father's lawsuit. <u>See Id.</u> at 571-72.

GREG's termination from MERCY is undisputed. Thus, GREG has satisfied the second element of his retaliation claim.

The Third Circuit recognizes three ways in which a Plaintiff can establish causation, the third element of a retaliation claim. <u>Kachmar v. SunGard Data</u>

Systems, Inc., 109 F.3d 173, 177 (3d Cir. 1997). A plaintiff must present evidence tending to establish the existence of either (1) "temporal proximity" between the protected activity and the retaliatory conduct, (2) a "pattern of antagonism" giving rise to an inference of retaliation, or (3) the Court may view the evidence "as a whole." Id.

Although GREG is only required to prove causation through any one of the three bases, GREG will prove causation through each of the three bases. First, STERRIL filed his Federal lawsuit on June 29, 1995. Eleven days later, Mr. Everhart distributed the Memo branding GREG as a "risk." Clearly, eleven days between the protected activity and an instance of retaliation permits the jury to draw an inference of retaliation based upon temporal proximity. See, Kachmar, 109 F.3d at 177 (earlier complaints were not only protected activity to be considered; later events are to be considered when evaluating temporal proximity). The Court in Kachmar emphasized that the third element of a retaliation claim is causation, not temporal proximity, and explained that temporal proximity "merely provides an evidentiary basis from which an inference may be drawn." Id. at 178.

The second and third bases for establishing causation under Kachmar – "pattern of antagonism" and "evidence as a whole" – are evidenced by numerous examples.

First, there is evidence in the record that GREG was continually questioned about the status of his father's lawsuit by Mr. Elias, who at times supervised both GREG and his father. (Fogleman Dep. at 48; Caines Dep. at 60). GREG refused to comment, and told Mr. Elias that he did not discuss his father's case with his father, but that if he did discuss the case with his father, "it would be nothing that [he] would share with [the HOSPITAL]." (Fogleman Dep. at 48). Notwithstanding GREG's comments to Mr. Elias, he continued to ask GREG about his father's case. In fact, GREG complained to Donald Caines about Mr. Elias' repeated inquiries and MERCY took no action to stop Mr. Elias. (Caines Dep. at 60; Fogleman Dep. at 46-50).

Second, on July 10, 1995, after consultation with MERCY's counsel, Martin Everhart, Vice President of Human Resources, widely distributed a Memorandum to all Department Directors and Supervisors at MERCY in which GREG was branded as "a risk" to MERCY due to STERRIL's lawsuit. (Dep. Exh. 1).

Third, following the memo, Mr. Everhart was "colder" to GREG than he had been previously. (Fogleman Dep. at 56). Mr. Everhart admittedly made a calculated decision that the "risk" was great enough to ignore written Policy when he wrote and distributed the Memo. (Everhart Dep. at 44-45).

Fourth, as a result of the Memo, GREG's reputation and character at MERCY were damaged and his integrity was questioned. (Fogleman Dep. at 51-

52). It also undermined his authority as a Supervisor with his employees and with other employees in MERCY. (Fogleman Dep. at 52).

Fifth, at that time, GREG told Betsy Dal Santo in the Marketing and Public Relations Department that he felt he was being targeted because of his father's lawsuit. (Dal Santo Dep. at 48, 60).

Sixth, Mr. Everhart felt that the "incident" in the Gift Shop involving GREG merited closer scrutiny because of STERRIL's lawsuit (Everhart Dep. at 121), even though there was no reason to question his loyalty. Thus, MERCY admittedly treated GREG differently than other employees only because he is STERRIL's son.

Seventh, MERCY offered inconsistent reasons for GREG's termination. Initially, MERCY claimed that GREG was terminated for failing to file a report. (Dep. Exh. 32). However, it is undisputed that GREG did file a report when Mr. Caines asked him to do so prior to the end of his shift, which was in accordance with MERCY procedure. (Caines Dep. at 149; Burke Dep. at 22). MERCY later claimed to the Unemployment Compensation Office that GREG was terminated for six different reasons, five of which had not been claimed at the time of his termination. (See, Dep. Exh. 33). During subsequent depositions, Mr. Caines retreated from MERCY's earlier position and admitted that several of the reasons offered to the Unemployment Claims Office were inaccurate. (Caines Dep. at 267-

271).  Finally, it will be established at trial that there were several inaccuracies in Mr. Caines' memo.  (See, e.g., Oeller Dep. at 52-53).  In fact, Ms. Oeller testified that Mr. Caines "changed what [she] said" with respect to how she though GREG obtained the spare key. (Oeller Dep. at 50-51).  Mr. Everhart admitted he would have considered these inaccuracies, if he had known of them.  (Everhart Dep. at 116-120).

Eighth, MERCY failed to follow its own written Policy on Progressive Discipline when it terminated GREG after almost 19 years of excellent service without even an allegation of intentional misconduct and without progressing through the steps required by the policy.  (See, Dep. Exh. 22).

Ninth, others in MERCY were accused of far worse infractions and they were not terminated for such behavior.  On the contrary, they received progressive discipline.  This includes an employee who was caught stealing from another employee's purse, an employee who was engaging in improper conduct with female summer students, and an employee who had a problem with alcoholism. (Caines Dep. at 273-278; Elias Dep. II at 5-6, 12-18).

Tenth, upon termination, others were offered a severance package, while GREG was not.  (Everhart Dep. at 135-136).  GREG's own supervisor, Ralph Evans was given the opportunity to retire, rather than be fired for performance reasons. (Everhart Dep. at 168-169).

Eleventh, despite GREG's years of service with MERCY, Donald Caines admitted that he never even looked at GREG's personnel file and did not consider the numerous commendations that GREG had received over the years for his service to MERCY. (Caines Dep. at 196). Others received the benefit of these considerations. (See, e.g., Elias Dep. II at 5-7).

Twelfth, no one in management at MERCY has been willing to take responsibility for making the decision to fire GREG. Ms. Edmondson, for example, indicated that the decision was made by Donald Caines. (Edmondson Dep. at 70). Mr. Caines indicated that he did not make the decision to terminate GREG; instead, he went to lengths in his memo of September 12, 1996 to recommend only that GREG be removed from the Security Department and made no such recommendation to terminate him. Mr. Caines indicated that individuals on the President's Council or his supervisors would be responsible for making such a determination. Mr. Everhart first testified that he, Mr. Caines and Ms. Edmondson collectively made the decision (Everhart Dep. at 22, 105), but later contradicted himself when he testified that the decision was either made or approved by Gail Blaum, Vice President of Mercy South and President's Council member. (Everhart Dep. at 178). Ms. Edmondson has also denied making the decision to fire GREG. (Edmondson Dep. at 53). Similarly, when individuals on the President's Council including Ms. Blaum, were deposed, each of them not only

denied making such a decision, but also denied any involvement in the decision making process. (Blaum Dep. at 14, 46-47; O'Brien Dep. at 12). Moreover, Ms. Brown testified that in GREG's case, the authority to fire rested with Donald Caines. (Blaum Dep. at 11-12).

Thirteenth, the job description for Supervisor of Security requires the filing of a report for any unusual activity. (Dep. Exh. 21). GREG did not view the Gift Shop "incident" as unusual (See Dep. Exh. 50; Fogleman Dep. at 125-126), but he filed an Incident Report before the end of his shift when Donald Caines asked him to file a report. (Dep. Exh. 50; Fogleman Dep. at 126; Caines Dep. at 136, 270).

Fourteenth, STERRIL's deposition was scheduled for September 17, 1996. GREG was repeatedly told on September 11, 1996, that he would not be informed of his fate until September 17th. (Fogleman Dep. at 139; Dal Santo Dep. at 85). GREG was told that MERCY could not get back to him until September 17th because it needed to complete its investigation. (Fogleman Dep. at 139-140; Dal Santo Dep. at 55-56). MERCY has admitted, however, that no investigation took place between September 11th, when GREG was suspended, and September 17th, when GREG was fired and when his father was scheduled to be deposed in his pending federal lawsuit. (Edmonson Dep. at 45-47, 53; Caines Dep. at 222; Dep. Exh. 27, ¶ 3.H.8.).

Fifteenth, there are also several instances of post-employment retaliation in this case. The Supreme Court has specifically recognized post-employment conduct as evidence of retaliation. Robinson v. Shell Oil Co., 519 U.S. 337, 117 S. Ct. 843, 849, 136 L. Ed. 2d 808 (1996). First, it is undisputed that Mr. Caines did not receive written statements from David Searfoss or Audrey Oeller upon which he could base his recommendation to terminate GREG until after GREG was fired. (Dep. Exh. 2, 30). Second, MERCY attempted to prevent witnesses from completing questionnaires forwarded by the PHRC in connection with GREG's complaint by "collecting" them before witnesses could respond. (Stozenski Dep. at 30-35; McCormick Dep. at 59-62). Third, GREG will establish that MERCY initially altered his final time card in order to deprive him personal time he had earned and also refused to pay GREG for his accrued vacation time when he was fired. MERCY continued to refuse to pay GREG's back wages for over three years, even after he filed his federal lawsuit. MERCY eventually paid an amount representing GREG's vacation pay and other personal time that he had accrued prior to his termination, plus liquidated damages and attorneys' fees, under the Wage Payment and Collection Law. Others had routinely received such vacation pay upon separation of employment. Fourth, MERCY appealed the granting of unemployment benefits to GREG, even though there were no allegations of willful

misconduct or any other legal basis to contest the award of benefits to GREG, and then withdrew its appeal on the eve of the hearing.

Clearly, the fifteen (15) pre-termination and four (4) post-termination examples of retaliation will more than suffice to permit the jury to create an inference of retaliation.

II.   DOES THE EVIDENCE IN THE RECORD ESTABLISH THAT THE PROFFERED REASONS FOR GREG FOGLEMAN'S TERMINATION OF EMPLOYMENT FROM MERCY WERE PRETEXTUAL?

*Suggested answer: Yes*

Once GREG establishes a prima facie case, the jury will be permitted to make an inference of retaliation. Sheridan, 100 F.3d at 1066-67. At this time, under the burden-shifting analysis, Defendant must establish a legitimate, non-discriminatory reason for terminating GREG's employment. Woodson, 109 F.3d at 920, n.2. As set forth herein, the record will show that MERCY's proffered reasons for firing GREG were false and pretextual. Thus, the jury can infer discrimination from the mere disbelief of the employer's proffered reasons, and upon such disbelief, no further evidence is necessary other than that which supported the plaintiff's prima facie case in order to sustain a verdict for the Plaintiff. Sheridan, 100 F.3d at 1066-67. In light of the numerous examples of pre- and post-termination retaliation, the jury has ample reason to disbelieve the proffered reasons for termination and make a finding of retaliation discrimination.

I.   **STIPULATIONS DESIRED**

1.   The parties have stipulated to the facts set forth in Section C of this Pre-Trial Memorandum.

2.   The parties have stipulated to the authenticity of Plaintiff's exhibits.

3.   The parties are considering additional stipulations.

**J.    ESTIMATED NUMBER OF TRIAL DAYS**

Four (4) days

**K.    ANY OTHER MATTER PERTINENT TO THE CASE TO BE TRIED**

None.

**L.    SCHEDULE OF EXHIBITS**

See Appendix "A."  Plaintiff reserves the right to use any exhibits identified by Defendants.

**M.    DESIRED SPECIAL VERDICT QUESTIONS**

See Appendix "B."

**N.    NOTIFICATION REQUIREMENTS**

Not applicable.

**O.    CERTIFICATE AS REQUIRED UNDER RULE 26.a**

See Appendix "C."

**P.    RULE 48.2**

Not applicable.

ROSENN, JENKINS & GREENWALD, L.L.P.

By: *James C Oschal / SCr²*

DONALD H. BROBST, ESQUIRE
JAMES C. OSCHAL, ESQUIRE
ELIZABETH C. LEO, ESQUIRE
15 South Franklin Street
Wilkes-Barre, PA 18711-0075
(570) 826-5621

Attorneys for Plaintiff,  GREG FOGLEMAN

APPENDIX "C"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GREG FOGLEMAN,
                   Plaintiff       :

        v.                      :          NO. 4:CV-98-1746

                      :

MERCY HOSPITAL, INC.,       :       (JUDGE MC CLURE)

                      :

                Defendant   :

## CERTIFICATE OF CONFERENCE TO REMOVE OBJECTIONS
## PURSUANT TO RULE 26.8

We, JAMES C. OSCHAL, Esquire and JOSEPH A. O'BRIEN, Esquire, counsel for the parties in the above-captioned matter, certify that we will confer in an effort to eliminate irrelevancies, side comments, resolved objections, and other matters not necessary for consideration by the trier of fact regarding any and all depositions to be used at trial. Good faith efforts have been made to remove such portions from such depositions prior to trial.

Date: _____    _____
                            JAMES C. OSCHAL, ESQUIRE
                            ROSENN, JENKINS & GREENWALD, L.L.P.
                            15 South Franklin Street
                            Wilkes-Barre, PA 18711
                            (570) 826-5621
                            Attorneys for PLAINTIFF

Date:_____    _____
                            JOSEPH A. O'BRIEN, ESQUIRE
                            OLIVER, PRICE & RHODES
                            1212 South Abington Road
                            P. O. Box 240
                            Clarks Summit, PA 18411
                            Attorneys for DEFENDANT



APPENDIX "A"

CLERK'S EXHIBIT LISTING

NO. 4:CV-98-1746

JUDGE: JAMES F. McCLURE, JR.

Abbreviated Name of Case: GREGORY FOGLEMAN v. MERCY HOSPITAL, INC.

Name of party submitting this list: Plaintiff, Gregory Fogleman

| PTF. | DEF. | DESCRIPTION OF OBJECT OR ITEM | DOCUMENT DATED | IDENTIFIED IN COURT | DATE ADMITTED | WITNESS ON STAND |
|------|------|-------------------------------|----------------|---------------------|---------------|------------------|
| 1. | | Complaint | 10/27/98 | | | |
| 2. | | Answer to Complaint | 12/9/98 | | | |
| 3. | | Defendant's Answers to Plaintiff's First Set of Interrogatories | 4/16/99 | | | |
| 4. | | Plaintiff's First Request for Production of Documents; Plaintiff's Second Request for Production of Documents; Defendant's Answers to Plaintiff's First and Second Request for Production of Documents | 4/16/99 | | | |
| 5. | | Plaintiff's Third Request for Production of Documents; Defendant's Answers to Plaintiff's Third Request for Production of Documents | 10/8/99 | | | |

377574-1

1

| PTF. | DEF. | DESCRIPTION OF OBJECT OR ITEM | DOCUMENT DATED | IDENTIFIED IN COURT | DATE ADMITTED | WITNESS ON STAND |
|---|---|---|---|---|---|---|
| 6. | | Memo from Mr. Everhart to Department Directors, Supervisors, Mercy South re: Sterril Fogleman | 7/10/95 | | | |
| 7. | | Handwritten statement of Ms. Oeller | 9/18/96 | | | |
| 8. | | Memo from Mr. Caines to Mr. O'Brien re: | 9/12/96 | | | |
| 9. | | Complaint of September 6, 1996 Schedule of Ms. Oeller | | | | |
| 10. | | Federal Complaint in Sterril Fogleman v. Mercy Hospital, Inc. – No. 3:CV-95-0957 | 6/16/95 | | | |
| 11. | | Memo from Mr. Elias to Mr. Caines re: Security Department, Mercy South | 12/21/95 | | | |
| 12. | | Correspondence from Mr. Elias to Mr. Fogleman | 2/12/95 | | | |
| 13. | | Memo from Mr. Fogleman to Hospice Staff re: Removal of Deceased Patients by Funeral Directors | 12/9/94 | | | |
| 14. | | Memo from Mr. Goodwin to Ms. Murphy, Sister Marie Parker and Mr. Elias re: Complimentary Patient Letter – Mrs. Roberta Light | 7/22/94 | | | |
| 15. | | Memo from Ms. Nanstiel to Mr. Burke re: Security Assistance for Library Meeting | 3/16/94 | | | |

377574-1

2

377574-1

| PTF. | DEF. | DESCRIPTION OF OBJECT OR ITEM | DOCUMENT DATED | IDENTIFIED IN COURT | DATE ADMITTED | WITNESS ON STAND |
|---|---|---|---|---|---|---|
| 16. | | Correspondence from Ms. Blaum and Mr. Elias to Mr. Fogleman re: thanks for commitment and efforts during the | 3/11/94 | | | |
| 17. | | Security Guard Report | 11/13/93 | | | |
| 18. | | Memo from Mr. Owens to Mr. Elias re: Security Supervisor | 10/18/93 | | | |
| 19. | | Correspondence from Mr. DeMichele to Mr. Fogleman re: appreciation for Cancer Center of Wyoming Valley | 4/30/93 | | | |
| 20. | | Correspondence from Mr. DeMichele to Ms. Blaum re: thanks re: parking problems at Cancer Center | 4/5/93 | | | |
| 21. | | Correspondence from Ms. Blaum and Mr. Elias to Mr. Fogleman re: appreciation | 3/17/93 | | | |
| 22. | | Memo from Ms. Scaz to Mr. Fogleman re: Mercy Home Care Nurses Parking in Doctors Lot | 2/18/93 | | | |
| 23. | | Correspondence from Mr. Everhart to Mr. Fogleman re: thanks | 6/24/92 | | | |
| 24. | | Transfer Requisition effective April 27, 1993 | | | | |
| 25. | | Transfer Requisition effective August 2, 1993 | | | | |
| 26. | | Job Description for Security/, Safety Supervisor | | | | |
| 27. | | Progressive Discipline Policy | | | | |

3

377574-1

| PTF. | DEF. | DESCRIPTION OF OBJECT OR ITEM | DOCUMENT DATED | IDENTIFIED IN COURT | DATE ADMITTED | WITNESS ON STAND |
|------|------|-------------------------------|----------------|---------------------|---------------|------------------|
| 28. | | Memorandum from Ms. Grandinetti to B. DalSanto, G. Fogleman, M. Fogleman, C. Shock, Sister Berrang, M. Synder, B. Sperrazza, C. Williamson, Dr. Kim, A. Kelly, P. Klosowski, J. Brennan, J. Carter, B. Pavill, K. Mozdian, P. Petlock, and M. Peloso re: thank you for volunteering to help at the Baby Fair | 8/23/94 | | | |
| 29. | | Statement of Betsy DalSanto | 9/11/96 | | | |
| 30. | | Correspondence from Ms. Edmondson to Mr. Fogleman re: the Separation Agreement and Release is now enclosed filed with the | 10/10/96 | | | |
| 31. | | Complaint filed with the PHRC to Docket No. E-82683A – Gregory Fogleman v. Mercy Hospital, Martin Everhart, Donald Caines, David Searfoss, John Burke and Joan Edmundson | 3/10/97 | | | |
| 32. | | Answer and New Matter to PHRC | 6/23/97 | | | |
| 33. | | Memo from Mr. Searfoss to Mr. Caines re: conversation with Ms. Oeller on September 6, 1996 | 9/18/96 | | | |
| 34. | | Memo from Mr. Caines to Mr. O'Brien re: meeting with Mr. Fogleman on September 17, 1996 | 9/17/96 | | | |

4

| PTF. | DEF. | DESCRIPTION OF OBJECT OR ITEM | DOCUMENT DATED | IDENTIFIED IN COURT | DATE ADMITTED | WITNESS ON STAND |
|---|---|---|---|---|---|---|
| 35. | | Correspondence from Mr. Caines to Ms. Mannick, UC Claims Representative re: responding to conflict of information | 10/2/96 | | | |
| 36. | | Correspondence from Mr. Everhart to Ms. Mannick re: responding to questions | 10/3/96 | | | |
| 37. | | Mercy Hospital Disciplinary Action Form for Kenneth Warman | 10/22/86 | | | |
| 38. | | Mercy Hospital Disciplinary Action Form for James Cain | 8/26/96 | | | |
| 39. | | Deposition transcript of Linda McCormick from the Sterril Fogleman v. Mercy Hospital matter | 9/20/96 | | | |
| 40. | | Paycheck stub of Mr. Fogleman for period ending September 21, 1996 | | | | |
| 41. | | Time card for Mr. Fogleman for pay ending October 19, 1996 | | | | |
| 42. | | PHRC Witness Statement addressed to Linda McCormick | | | | |
| 43. | | Handwritten list of names | | | | |
| 44. | | Memo from Mr. Everhart to Members of Recreation Committee | 9/7/94 | | | |
| 45. | | Mercy Hospital newsletter | 9/22/93 | | | |
| 46. | | Handwritten note from Mr. Everhart to Mr. Fogleman | 11/24/91 | | | |

377574-1

5

| PTF. | DEF. | DESCRIPTION OF OBJECT OR ITEM | DOCUMENT DATED | IDENTIFIED IN COURT | DATE ADMITTED | WITNESS ON STAND |
|---|---|---|---|---|---|---|
| 47. | | Handwritten note from Mr. Everhart to Mr. Fogleman | 10/23/92 | | | |
| 48. | | Deposition transcript of Mr. Everhart in the Sterril Fogleman v. Mercy Hospital case | 6/18/96 | | | |
| 49. | | Deposition transcript of Mr. Everhart in the Sterril Fogleman v. Mercy Hospital case | 6/24/96 | | | |
| 50. | | Deposition transcript of Mr. Everhart in the Sterril Fogleman v. Mercy Hospital case | 7/21/95 | | | |
| 51. | | Conflict of Interest Disclosure Statement | 2/20/97 | | | |
| 52. | | Correspondence from Mr. Oschal to Mr. Everhart | | | | |
| 53. | | Warning Record | 10/21/82 | | | |
| 54. | | Memo from Ms. George to Mr. Evans re: follow-up to April 8th meeting | 4/9/87 | | | |
| 55. | | Memo from Ms. George to Mr. Evans re: incident of April 22, 1987 | 4/24/87 | | | |
| 56. | | Deposition transcript of Mr. Searfoss in Sterril Fogleman v. Mercy Hospital case | 7/11/96 | | | |
| 57. | | Time card for Mr. Fogleman for pay ending October 19, 1996 | | | | |
| 58. | | Security Guard Report of Mr. Fogleman | 9/6/96 | | | |
| 59. | | PHRC Witness Statement for Shelia Robertson | | | | |
| 60. | | Job description for V. Gail Blaum | | | | |
| 61. | | Memo from Ms. Blaum | 5/19/94 | | | |
| | | Correspondence form Mr. DeMichele to Ms. Blaum | 3/29/93 | | | |

6

377574-1

377574-1

| PTF. | DEF. | DESCRIPTION OF OBJECT OR ITEM | DOCUMENT DATED | IDENTIFIED IN COURT | DATE ADMITTED | WITNESS ON STAND |
|---|---|---|---|---|---|---|
| 62. | | Correspondence from Mr. Goodwin to Dear Mercy Family Members re: Blizzard | 3/15/93 | | | |
| 63. | | Mr. Fogleman's performance evaluations | | | | |
| 64. | | Report of Dr. Verzilli | 11/1/99 | | | |
| 65. | | Supplemental report from Dr. Verzilli | 6/3/02 | | | |
| 66. | | Second Supplemental Report of Dr. Verzilli calculating economic damages through March 2003 | 1/03 | | | |
| 67. | | Order and Memorandum of Judge Vanaskie in Sterril Fogleman v. Mercy Hospital denying Motion for Summary Judgment | | | | |
| 68. | | Correspondence between the parties relating to the $750.00 payment for wages due Greg Fogleman | | | | |
| 69. | | Separation Agreement and Release | | | | |
| 70. | | Documents relating to the Pension Plan | | | | |
| 71. | | Deposition of Audrey Oeller | 5/13/99 | | | |
| 72. | | Deposition of Betsy Dal Santo | 9/30/99 | | | |
| 73. | | Deposition of Donald D. Caines | 10/1/99 | | | |
| 74. | | Deposition of Linda McCormick | 10/7/99 | | | |
| 75. | | Deposition of Martin S. Everhart | 10/11/99 | | | |
| 76. | | Deposition of David J. Searfoss | 10/11/99 | | | |
| 77. | | Deposition of John Burke | 10/13/99 | | | |

| PTF. | DEF. | DESCRIPTION OF OBJECT OR ITEM | DOCUMENT DATED | IDENTIFIED IN COURT | DATE ADMITTED | WITNESS ON STAND |
|------|------|-------------------------------|----------------|---------------------|---------------|------------------|
| 78. | | Deposition of Michael Elias | 10/13/99 | | | |
| 79. | | Deposition of Michael Elias | 5/13/99 | COURT | | |
| 80. | | Deposition of Joan Edmondson | 10/13/99 | | | |
| 81. | | Deposition of Lena Michael | 10/14/99 | | | |
| 82. | | Deposition of Sheila Stozenski | 10/21/99 | | | |
| 83. | | Deposition of Virginia Gail Blaum | 11/5/99 | | | |
| 84. | | Deposition of James O'Brien | 11/5/99 | | | |
| 85. | | Deposition of Greg Fogleman | 10/12/99 | | | |

All parties reserve the right to supplement this List of Exhibits at any time before trial. In addition, the parties reserve the right to present enlarged copies of these exhibits, charts containing information taken from these exhibits, or other compilations of information contained in these exhibits. Finally, the parties reserve the right to use as an exhibit any document even though not listed here which was produced in discovery or to use the transcript of any deposition taken in this matter.

8

377574-1



APPENDIX "B"

1.   Did Mercy Hospital terminate Greg Fogleman's employment in retaliation for his father's lawsuit against MERCY Hospital?

_____YES          \_\_\_\_\_NO


2.   Did Mercy Hospital willfully retaliate against Greg Fogleman?

_____YES          \_\_\_\_\_NO

If your answer to question number 1 or 2 is "yes", then answer questions 3 and 4.

If your answers to question numbers 1 and 2 are both "no", then do not answer question 3.


3.   What amount of damages did Plaintiff, Greg Fogleman, sustain as a result of Defendant's decision to terminate him in retaliation for his father's lawsuit for each of the following:

a.   For lost past wages (back pay and benefits) \$_____

b.   For front pay \$_____

c.   For lost future earnings \$_____

d.   For past, present and future emotional distress and mental anguish \$_____

e.   For past, present and future humiliation and embarrassment \$_____

f.   For past, present and future discomfort and distress \$_____

g.   For past, present and future loss of pleasures and enjoyment of life \$_____

4.    Do you find by a preponderance of the evidence that the decision of Defendant, Mercy Hospital to terminate Greg Fogleman in retaliation for his father's lawsuit shows a reckless disregard of, or indifference to, the right of the Greg Fogleman not to be retaliated against?

_____YES          _____NO

If your answer to question 4 is yes, what amount of punitive damages do you award against Defendant Mercy Hospital?

$_____



# Verzilli & Verzilli and Consultants, Inc.
## Consulting Economists

Andrew G. Verzilli, Ph.D.
    Emeritus Professor of Economics, Drexel University
Andrew C. Verzilli, M.B.A.
    Economist & Analyst
Edward C. Boyer, Ph.D.
    Economist & Analyst

Office Address:
4096 Durham Road
Ottsville, PA 18942

(610) 847-8655
Fax: (610) 847-8729

Mailing Address:
P.O. Box 67
Kintnersville, PA  18930

November 1, 1999

Elizabeth Leo, Esquire
Rosenn, Jenkins & Greenwald, L.L.P.
15 South Franklin Street
Wilkes-Barre, PA  18711

RE:    Gregory Fogelman v. Mercy Hospital

Dear Ms. Leo:

The following is our preliminary analysis of the present values of differences in earning capacity relative to Gregory Fogelman. Mr. Fogelman was terminated from his employment with Mercy Hospital on September 17, 1996.

## Background

Gregory Fogelman was born on September 12, 1956. He is presently 43.16 years of age, with an average statistical life expectancy of an additional 32.86 years (Life Tables, 1995).

At the time of the termination, Mr. Fogelman was a supervisor in the security department. He was earning a base annual salary of $27,851 ($13.39 per hour). Mr. Fogelman also received fringe benefits that included health insurance, dental insurance, and retirement contributions. He had been employed at Mercy Hospital from January, 1978 up to the date of the termination.

Mr. Fogelman secured alternative employment as a customer service representative for Benco Dental in April, 1998. He is presently earning $8.00 per hour. There is no retirement plan and he is paying $2,409 for health insurance benefits (health, dental and vision).  Mr. Fogelman applied for numerous security positions, but was unable to secure comparable employment in that field.

In addition, Mr. Fogelman is a high school graduate.

**Fogelman v. Mercy Hospital**                                    Page 2

## Methodology

### Pre-Termination Earning Capacity

At this time, we have estimated the value of pre-termination earning capacity relative to Gregory Fogelman based on his annual salary in 1996, $27,851. This figure has been increased to a 1999 base earnings of $31,277. We utilized normal increases in wages of the private sector of the economy since 1996 to adjust the base earnings to 1999 terms (Economic Report of the President).

### Post-Termination Earning Capacity

Post-termination earning capacity is estimated based on Mr. Fogelman's present hourly rate of $8.00, $16,640 annually. In addition, we have considered his actual earnings since April, 1998 in the estimate of back-pay.

### Duration of Estimates

We have presented two estimates with respect to the future period for front-pay. The first estimate is based on normal retirement at age 65. It should noted that there is no mandatory retirement age in the United States and there are signs that the normal retirement age will be increasing (changes in Social Security). The second estimate assumes that post-termination earnings will "catch-up" to pre-termination earnings within ten years from the present.

This range of estimates is presented in view of 1) Mr. Fogelman's pre-termination employment/earnings, 2) his age and educational attainment, 3) his present earnings, and 4) the fact that he is now working in a different field than security.

It should be noted that the longer Mr. Fogelman remains earning $8.00 per hour, the less likely a catch-up in earnings will occur within ten years.

### Fringe Benefits

As noted above, Mr. Fogelman is paying $2,409 annual four health insurance benefits. Accordingly, we have estimated pre-termination health benefits based on this value. The present value of future health benefits has been estimated based on a net annual growth rate of .65% and net annual discount rate of 1%. This range represents both the long-term and short-term relationship between increases in medical care costs and yields on short-term treasury bills.

The value of retirement benefits has been estimated in accordance with the Mercy Hospital Cash Balance Plan. Accordingly, employer contributions are as follows:

          Age 35 to 44        7.0% of earnings
          Ages 44 and older   8.0% of earnings

We have not considered benefits in post-termination employment given the information provided. However, with respect to the "catch-up" estimate, benefits are assumed to be comparable at the end of the catch-up period.

**Fogelman v. Mercy Hospital**                                    Page 3

## Present Value of Base Salary

The present value of earning capacity has been estimated based on net annual discount rates in the range of 0% (future increases in wages are equal to the discount rate) to 2.5% (future increases in wages are 2.5% lower than the discount rate). This range has been presented in order to reflect, in a statistically reasonable manner, both the long-term historical relationship between growth rates in wages and interest rates, and as well, the more recent but significant changes in this relationship (Economic Report of the President). The interest rate utilized is based on a reasonable rate of return, for an unsophisticated investor, purchasing a riskless investment, with a high degree of liquidity.

In further support of this range of net discount rates, note the following data:

| Period | Average Annual Increase in Earnings | Average Yield 3 month T-Bills |
|--------|-------------------------------------|-------------------------------|
| 1959-1998 | 4.81% | 5.98% |
| 1969-1998 | 5.13% | 6.75% |
| 1979-1998 | 4.13% | 7.13% |
| 1989-1998 | 3.24% | 5.22% |
| 1994-1998 | 3.40% | 4.94% |

## Earning Capacity

Earning capacity may be defined as that level of income which an individual may reasonably be expected to receive from work given that individual's age, level of educational attainment, particular skills and talents, actual earnings and work history, intentions, and the supply and demand conditions in the labor market relative to the individual's realistic employment choices. It should be noted that the realization of earning capacity may be a function of both economic and non-economic factors.

## Summary

Based on the information provided to date and the methodology discussed, we have estimated the difference in earning capacity relative to Gregory Fogelman as follows:

| | |
|--|--|
| Difference in Back-Pay (9/96 to 11/99) | $83,637 |
| Difference in Front-Pay (10 year Catch-up) | $120,456 to $137,320 |
| Difference in Front-Pay (to Age 65) | $332,187 to $430,028 |

These estimates are limited to the difference in earning capacity only and do not reflect other compensatory damages. In addition, these estimates do not reflect interest on the back-pay difference in earnings.

**Fogelman v. Mercy Hospital**                                              **Page 4**

The following pages are summary tables of the values of the estimates.  If you have any questions, please contact us.

Sincerely,

Andrew G. Verzilli, Ph.D.

Andrew C. Verzilli, M.B.A.

**Gregory Fogelman**                                                        **1-Nov-99**
**Table 1: Back-Pay (Sept., 1996 to November, 1999)**

**Pre-Termination: $27,851 Annually in 1996**
**Post-Termination: $8.00 per hour as of April, 1998**

| Year | Pre-Termination | Actual |
|------|-----------------|--------|
| 1996 | $8,021 | $0 |
| 1997 | $28,918 | $0 |
| 1998 | $30,074 | $10,207 |
| 1999 | $26,064 | $13,867 |
| | | |
| Earnings | $93,078 | $24,074 |
| Health Insurance | $8,118 | $0 |
| Retirement | $6,515 | $0 |
| Total | $107,711 | $24,074 |
| | | |
| Difference in Back-Pay | | $83,637 |

**Gregory Fogelman**                                                    1-Nov-99
Table 2: Front-Pay (10 Year Catch-up)

Pre-Termination: $31,277 Annually in 1999
Post-Termination: $16,640 Annually (present earnings)

Pre-Termination

| Age | Net Annual Discount 0.00% | Net Annual Discount 1.50% | Net Annual Discount 2.50% |
|---|---|---|---|
| 43.16 | $31,277 | $30,815 | $30,514 |
| 44.16 | $31,277 | $30,359 | $29,770 |
| 45.16 | $31,277 | $29,911 | $29,044 |
| 46.16 | $31,277 | $29,469 | $28,335 |
| 47.16 | $31,277 | $29,033 | $27,644 |
| 48.16 | $31,277 | $28,604 | $26,970 |
| 49.16 | $31,277 | $28,181 | $26,312 |
| 50.16 | $31,277 | $27,765 | $25,670 |
| 51.16 | $31,277 | $27,355 | $25,044 |
| 52.16 | $31,277 | $26,950 | $74,434 |
| | | | |
| Total Earnings | $312,770 | $288,442 | $273,738 |
| Health Insurance | $24,807 | $22,816 | $25,203 |
| Retirement | $24,396 | $22,464 | $21,296 |
| | | | |
| Total Pre-Termination | $361,973 | $333,722 | $320,238 |

Post-Termination

| Age | Net Annual Discount 0.00% | Net Annual Discount 1.50% | Net Annual Discount 2.50% |
|---|---|---|---|
| 43.16 | $16,640 | $16,640 | $16,640 |
| 44.16 | $17,723 | $17,472 | $17,306 |
| 45.16 | $18,877 | $18,346 | $17,998 |
| 46.16 | $20,106 | $19,263 | $18,718 |
| 47.16 | $21,415 | $20,226 | $19,466 |
| 48.16 | $22,809 | $21,237 | $20,245 |
| 49.16 | $24,294 | $22,299 | $21,055 |
| 50.16 | $25,875 | $23,414 | $21,897 |
| 51.16 | $27,560 | $24,585 | $22,773 |
| 52.16 | $29,354 | $25,814 | $23,684 |
| | | | |
| Total Earnings | $224,653 | $209,296 | $199,782 |

| Difference in Front-Pay | $137,320 | $124,426 | $120,456 |
|---|---|---|---|

**Gregory Fogelman**                                                              **1-Nov-99**
**Table 3: Front-Pay (Retirement at Age 65)**

**Pre-Termination: $31,277 Annually in 1999**
**Post-Termination: $16,640 Annually (present earnings)**

Pre-Termination

| Age | Net Annual Discount 0.00% | Net Annual Discount 1.50% | Net Annual Discount 2.50% |
|---|---|---|---|
| 43.16 | $31,277 | $30,815 | $30,514 |
| 44.16 | $31,277 | $30,359 | $29,770 |
| 45.16 | $31,277 | $29,911 | $29,044 |
| 46.16 | $31,277 | $29,469 | $28,335 |
| 47.16 | $31,277 | $29,033 | $27,644 |
| 48.16 | $31,277 | $28,604 | $26,970 |
| 49.16 | $31,277 | $28,181 | $26,312 |
| 50.16 | $31,277 | $27,765 | $25,670 |
| 51.16 | $31,277 | $27,355 | $25,044 |
| 52.16 | $31,277 | $26,950 | $24,434 |
| 53.16 | $31,277 | $26,552 | $23,838 |
| 54.16 | $31,277 | $26,160 | $23,256 |
| 55.16 | $31,277 | $25,773 | $22,689 |
| 56.16 | $31,277 | $25,392 | $22,136 |
| 57.16 | $31,277 | $25,017 | $21,596 |
| 58.16 | $31,277 | $24,647 | $21,069 |
| 59.16 | $31,277 | $24,283 | $20,555 |
| 60.16 | $31,277 | $23,924 | $20,054 |
| 61.16 | $31,277 | $23,571 | $19,565 |
| 62.16 | $31,277 | $23,222 | $19,087 |
| 63.16 | $31,277 | $22,879 | $18,622 |
| 64.16 | $26,273 | $18,934 | $15,261 |
| | | | |
| Total Earnings | $683,090 | $578,797 | $521,465 |
| Health Insurance | $56,334 | $47,053 | $47,053 |
| Retirement | $54,022 | $45,692 | $41,114 |
| | | | |
| Total Pre-Termination | $793,445 | $671,542 | $609,633 |
| | | | |
| LESS: | | | |
| | | | |
| Post-Term. Earnings | $363,418 | $307,944 | $277,446 |
| | | | |
| Difference in Front-Pay | $430,028 | $363,599 | $332,187 |

# Verzilli & Verzilli and Consultants, Inc.
## Consulting Economists

Andrew G. Verzilli, Ph.D.
Emeritus Professor of Economics, Drexel University
Andrew C. Verzilli, M.B.A.
Economist & Analyst

Office Address:
4096 Durham Road
Ottsville, PA 18942

(610) 847-8655
Fax: (610) 847-8729

Mailing Address:
P.O. Box 67
Kintnersville, PA 18930

June 3, 2002

Elizabeth Leo, Esquire
Rosenn Jenkins & Greenwald, LLP
15 South Franklin Street
Wilkes-Barre, PA 18711

Re:    Gregory Fogelman v. Mercy Hospital

Dear Ms. Leo:

The following is an addendum to our November, 1999 report relative to the above matter. The estimates of differences in back-pay and front-pay have been revised as follows:

- Difference in Back-Pay is from Sept., 1996 to October, 2002.
- Difference in Front-Pay is for the periods of October, 2002 for ten years (Catch-Up) and to retirement at age 65.
- Pre-Termination earnings have been updated to a 2002 base annual salary of $35,192 (Bureau of Labor Statistics).
- Post-termination earnings based on actual W-2 earnings from 1999 to 2001. As of 2001, post-termination base salary is $20,300 annually

Other than indicated above, the data, assumptions and methodology discussed in our preliminary report remain intact.

The following pages are revised summary tables of the estimates. If you have any questions, please contact us.

Sincerely,

Andrew G. Verzilli, Ph.D.

Andrew C. Verzilli, M.B.A.

Gregory Fogelman                                                    3-Jun-02
Table A-1: Back-Pay (September, 1996 to October, 2002)

Pre-Termination : $27,851 Annually in 1996
Post-Termination : Alternative Employment

| Year | Pre-Termination | Actual |
|---|---|---|
| 1996 | $8,021 | $0 |
| 1997 | $28,940 | $0 |
| 1998 | $30,127 | $10,207 |
| 1999 | $31,223 | $16,237 |
| 2000 | $32,419 | $19,961 |
| 2001 | $33,777 | $20,300 |
| 2002 | $26,394 | $15,225 |
| | | |
| Total Earnings | $190,901 | $81,930 |
| Health Benefits | $14,550 | $0 |
| Retirement | $13,965 | $0 |
| Grand Total | $219,416 | $81,930 |
| | | |
| Difference in Back-Pay | | $137,486 |

Gregory Fogelman
Table A-2: Front-Pay : 10 Year Catch-Up

3-Jun-02

Pre-Termination : $35,192 annually in 2002
Post-Termination : Alternative Employment

Pre-Termination

| Age | Net Annual Discount 0.00% | Net Annual Discount 1.50% | Net Annual Discount 2.50% |
|---|---|---|---|
| 46.1 | $35,192 | $34,672 | $34,334 |
| 47.1 | $35,192 | $34,160 | $33,496 |
| 48.1 | $35,192 | $33,655 | $32,679 |
| 49.1 | $35,192 | $33,157 | $31,882 |
| 50.1 | $35,192 | $32,667 | $31,105 |
| 51.1 | $35,192 | $32,185 | $30,346 |
| 52.1 | $35,192 | $31,709 | $29,606 |
| 53.1 | $35,192 | $31,240 | $28,884 |
| 54.1 | $35,192 | $30,779 | $28,179 |
| 55.1 | $35,192 | $30,324 | $27,492 |

| | | | |
|---|---|---|---|
| Total Earnings | $351,920 | $324,547 | $308,003 |
| Health Insurance | $24,807 | $24,090 | $22,816 |
| Retirement Benefits | $28,154 | $25,964 | $24,640 |
| Total Pre-Termination | $404,881 | $374,601 | $355,459 |
| LESS: | | | |
| Post-Term. Earnings | $263,213 | $245,426 | $234,331 |
| Difference in Front-Pay | $141,668 | $129,175 | $121,128 |

Gregory Fogelman
Table A-3: Front-Pay : To Age 65

3-Jun-02

Pre-Termination : $35,192 annually in 2002
Post-Termination : Alternative Employment

Pre-Termination

| Age | Net Annual Discount 0.00% | Net Annual Discount 1.50% | Net Annual Discount 2.50% |
|---|---|---|---|
| 46.1 | $35,192 | $34,672 | $34,334 |
| 47.1 | $35,192 | $34,160 | $33,496 |
| 48.1 | $35,192 | $33,655 | $32,679 |
| 49.1 | $35,192 | $33,157 | $31,882 |
| 50.1 | $35,192 | $32,667 | $31,105 |
| 51.1 | $35,192 | $32,185 | $30,346 |
| 52.1 | $35,192 | $31,709 | $29,606 |
| 53.1 | $35,192 | $31,240 | $28,884 |
| 54.1 | $35,192 | $30,779 | $28,179 |
| 55.1 | $35,192 | $30,324 | $27,492 |
| 56.1 | $35,192 | $29,876 | $26,821 |
| 57.1 | $35,192 | $29,434 | $26,167 |
| 58.1 | $35,192 | $28,999 | $25,529 |
| 59.1 | $35,192 | $28,571 | $24,906 |
| 60.1 | $35,192 | $28,148 | $24,299 |
| 61.1 | $35,192 | $27,732 | $23,706 |
| 62.1 | $35,192 | $27,323 | $23,128 |
| 63.1 | $35,192 | $26,919 | $22,564 |
| 64.1 | $31,673 | $23,869 | $19,812 |
| | | | |
| Total Earnings | $665,129 | $575,418 | $524,936 |
| Health Insurance | $48,278 | $45,530 | $41,299 |
| Retirement Benefits | $53,210 | $46,033 | $41,995 |
| | | | |
| Total Pre-Termination | $766,617 | $666,981 | $608,230 |
| | | | |
| LESS: | | | |
| Post-Term. Earnings | $383,670 | $331,932 | $302,816 |
| | | | |
| Difference in Front-Pay | $382,947 | $335,050 | $305,414 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GREGORY FOGLEMAN,                    :
                                     :
                    Plaintiff        :          No. 4:CV-98-1746
          v.                         :          (Judge McClure)
                                     :
MERCY HOSPITAL, INC.,                :          Jury Trial Demanded
                                     :
                    Defendant        :

### CERTIFICATE OF SERVICE

JAMES C. OSCHAL, ESQUIRE, hereby certifies that on the 27th day of

January, 2003, he caused to be served a true and correct copy of the foregoing

PRE-TRIAL MEMORANDUM, by FedEx to:

            Joseph A. O'Brien, Esquire
            Oliver, Price & Rhodes
            1212 South Abington Road
            P. O. Box 240
            Clarks Summit, PA 18411


            _James C. Oschal / JGP_
            JAMES C. OSCHAL, ESQUIRE